UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-10434-RWZ

NECA-IBEW PENSION FUND, *et al.*

v.

NEUROMETRIX INC., *et al.*

ORDER

December 8, 2009

ZOBEL, D.J.

Neurometrix shareholders bring this class action against the corporation and three of its corporate executives: Shai N. Gozani, the firm's founder and CEO; W. Bradford Smith, the CFO through June 2008; and Gary L. Gregory, the COO through May 2008.[1]  The amended complaint (Docket # 32) alleges that various statements by defendants were materially misleading or false in violation of sections 10(b) and 20(a) of the Securities and Exchange Act of 1934. 15 U.S.C. §§ 78j(b), 78t(a); see SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.[2]  Defendants now move jointly to dismiss under Fed. R. Civ. P. 12(b)(6).

---

[1]This action was consolidated with another, later-filed shareholder class action against Neurometrix.  (Docket # 24.)  The putative class includes all shareholders who purchased common stock between October 27, 2005, and February 12, 2008.

[2]The § 20(a) claim applies only to the individual defendants and is dependent upon a finding of section 10(b) liability.  See 15 U.S.C. § 78t(a).

**I.     Background**

Neurometrix produces medical devices, including the NC-Stat, its first product, launched in 1999.[3] The NC-Stat is a largely automated, non-invasive device for measuring nerve conduction and can be operated by primary care physicians. More than 5,000 physicians' offices have the device and more than one million patients have been tested. It costs around $5,000, and each procedure requires several single-use biosensors priced at $35 each. Prior to NC-Stat, nerve conduction was measured with an invasive exam which required the particular skill of a neurologist.

Insurers reimburse the cost of medical procedures such as NC-Stat according to particular formulae that vary from insurer to insurer, but the billing process always begins with a Current Procedural Terminology ("CPT") billing code, a five-digit identifier for medical procedures. For Medicare and most private insurers, that CPT code has a corresponding number of relative value units ("RVU"s), which are units of value on an arbitrary scale. The RVU for a CPT code is determined by a non-governmental committee and reflects the estimated physician, practice, and malpractice costs for the service represented by that code. The RVU is then multiplied by a per-unit dollar amount, which may vary from year to year, to arrive at the reimbursement total.

The traditional nerve conduction examination was billed to one of three CPT codes (the "neurology CPT codes"). Neurometrix recommended to physicians that they

---

[3]When considering a motion to dismiss, this court must take as true the well-pleaded facts as they appear in the complaint and give the plaintiff the benefit of every reasonable inference in his favor.  Vernet v. Serrano-Torres, 566 F.3d 254, 258 (1st Cir. 2009).

bill the NC-Stat to these existing codes. Within the company, however, there was disagreement as to the appropriate reimbursement strategy. Two directors of reimbursement believed that it was improper for doctors to bill NC-Stat to the neurology CPT codes, because the RVUs for those codes were calculated based on the estimated cost of an expensive and complicated technique of measurement performed by a highly trained neurologist, not the less expensive NC-Stat test conducted by a general practitioner. The directors recommended that Neurometrix apply for a new CPT code for NC-Stat and in the meantime tell doctors to bill NC-Stat to a different miscellaneous CPT code. The company did not adopt their recommendation and continued to promote the use of the neurology CPT codes.

The level of reimbursement to physicians, and therefore the applicable CPT code, is critical to the commercial success of NC-Stat. Doctors are unlikely to purchase NC-Stat if its use is unprofitable. The neurology CPT codes generated lucrative reimbursement for doctors, while the miscellaneous CPT code would provide minimal reimbursement.

Initially, doctors were successful in billing NC-Stat to the neurology CPT codes. However, in late 2005 Blue Cross Blue Shield of both North and South Carolina began to deny reimbursement, and in the fall of 2006 and during 2007 a growing number of insurers followed suit. At the same time, many insurers continued to reimburse for NC-Stat.

In early 2007 the AMA panel responsible for CPT coding formed a committee to examine the coding of automated nerve conduction studies including the NC-Stat.

Three outcomes were possible for NC-Stat: (1) coverage under the neurology codes; (2) a new category I CPT code that would result in insurance coverage but lower reimbursement; and (3) a new category III CPT code that would result in coverage limitations and minimal reimbursement. In January 2009 the AMA panel decided to establish a new category I CPT code applicable to the NC-Stat, effective January 1, 2010.

## II.     Analysis

The complaint must state a "plausible entitlement to relief" to survive a motion to dismiss. Vernet, 566 F.3d at 258. Because the complaint alleges fraud, it is subject to the heightened pleading requirements of Fed. R. Civ. P. 9, which requires the plaintiff to state the circumstances of the fraud with particularity.

The elements of a Rule 10b-5 securities fraud claim are (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation. ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008). Plaintiffs must "specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading." Id. (citing the Private Securities Litigation Reform Act "(PSLRA"), 15 U.S.C. § 78u-4(b)(1)).

### A.     Plaintiffs' Argument - Material Misrepresentation or Omission

Plaintiffs allege that some 19 statements relating to reimbursement, found in Neurometrix' Form 10-Q and 10-K filings with the SEC and spoken in quarterly earnings-report conference calls, are materially false or misleading. The statements

are incorporated into the complaint as long, block-quotation passages containing hundreds or thousands of words, single-spaced, and extending up to three pages of the complaint in length.  (See, e.g., Amended Complaint ¶ 159.)  These statements are then followed by a laundry list, or a reference to a laundry list, of allegations why the statement is misleading. (See, e.g., ¶ 160.)  Some of these allegations are made in respect to most or all of the statements; others are specific to a small number or a single statement.  This presentation makes it difficult to determine what, exactly, is alleged to be misleading, and why. Cf. Osher v. JNI Corp., 256 F. Supp.2d 1133, 1155 (S.D. Cal. 2003) (declining to guess which statements in a single-spaced, block-quote are false or misleading, and holding the quote fails to satisfy the PSLRA pleading requirements).

As best can be discerned, based on the factual allegations in the complaint, the substance of the plaintiffs' argument is that defendants' warnings regarding the risk of non-reimbursement were misleading or false because defendants knew the level of risk, or even a certainty, of non-reimbursement under existing CPT codes was more serious than was disclosed in the warnings.  (See Pls.' Mem. in Opp'n 17, Docket # 44.)  This central allegation appears in ¶ 135, where it is identified as reason (d), following the first challenged statement.

The remaining allegations as to why the statements are misleading relate to specific factual disclosures or non-disclosures, each of which could be understood as support for the central allegation.  There is no freestanding duty to disclose these facts, see Chiarella v. United States, 445 U.S. 222, 235 (1980) (holding "a duty to disclose

under § 10(b) does not arise from the mere possession of non-public information"), and a corporation has no obligation to disclose all facts about a subject because there is disclosure of some facts concerning that subject, see Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990) (holding defendant's disclosure that a product was sold below cost did not require disclosure of how much below or the volume of sales). Rather, any requirement to disclose stems from the duty not to make misleading statements. Id.

The analysis that follows looks first at the two sets of allegations addressed to most or all of the statements, and then at the statement-specific allegations in the chronological order of their corresponding statement(s).

    **B.**    **Allegations Regarding Most or All Statements**

        **1.**    **¶ 135 - All Statements**

Plaintiffs allege that each of the statements by defendants was false or misleading for, at a minimum, the following four reasons: (a) Neurometrix did not apply for a new CPT billing code even though told to do so by two directors of reimbursement; (b) the sales staff "improperly promoted . . . the improper use" of neurology-based CPT codes; (c) defendants recklessly disregarded advice from reimbursement experts that the use of existing neurology-based CPT codes was fraud; and (d) (the central theme of the complaint) defendants failed to disclose a serious risk that insurers would not reimburse for NC-Stat under existing neurology based CPT codes.

Plaintiffs' central allegation that these warnings were insufficient, or that non-

reimbursement was a certainty known to defendants, is more than the factual allegations in the complaint will bear.  The complaint establishes, at most, that at certain points in time there was internal disagreement as to the applicability of existing CPT codes, but that a large, albeit declining, percentage of physicians were reimbursed for the use of the NC-Stat.  Put simply, the reimbursement environment was uncertain; there was <u>risk</u>.  The alleged misstatements contain express warnings of this risk, in more severe terms as reimbursement problems developed, that third-party payer reimbursement was essential to NC-Stat's success and insurers may cease reimbursement.  (Compare the company's statements in ¶ 136 with those in ¶ 150.)

Further, the warnings contain express disclosures of defendants' belief that existing CPT codes applied to the NC-Stat and the basis for that belief (<u>see</u> ¶ 157), and of the contrary policy pursued by some insurers (<u>see</u> ¶ 159).  Investors were fully informed as to both defendants' reimbursement strategy and the substance of the dispute with insurance companies, and they could make their own judgment as to whether that strategy was wise or ill-considered.

The remaining three reasons in ¶ 135 can be addressed quickly.  Reason (a) relates to specific opinions of directors of reimbursement, but none of the alleged misstatements mention the directors or their opinions.  Reason (b) is incomprehensible.  It is unclear what is meant by "improperly promoted," whether it refers to the process of marketing or what was being marketed.  Reason (c) fails because the complaint contains no factual allegations regarding the basis of the opinion of the reimbursement experts.  Nor, for example, can the opinion of the reimbursement experts support the

charge of recklessness or falsity in the Form 10-K filed March 16, 2006, ¶ 138. Defendants' statement that NC-Stat could be reimbursed under existing neurology CPT codes was not only characterized as their "belief," but it was immediately followed by cautionary language that any changes in CPT codes may adversely affect reimbursement for NC-Stat. Consequently, the general allegations in ¶ 135 do not establish that any of the statements are false or misleading.

### 2.   ¶ 139 - All but Two Statements

Plaintiffs allege that all but two of the statements were false or misleading for failing to disclose (1) that NC-Stat was marketed for use by non-medical staff; (2) that the use of NC-Stat often precluded reimbursement for other neurological procedures; and (3) the FDA approved NC-Stat as a supplement and not a replacement for existing nerve conduction tests.

None of these reasons establish that the statements are false or misleading. The subjects of non-medical staff usage, reimbursement for third-party procedures, and the details of FDA approval are all beyond the scope of the reimbursement disclosures. None of the statements make any assertion concerning these topics.

### C.   Allegations Specific to Particular Statements

#### 1.   October 27, 2005 Press Release; 3Q 2005 10-Q; 2005 10-K; 1Q 2006 10-Q; February 1, 2007 Conference Call; 2006 10-K (¶¶ 134, 136, 138, 140, 153, 155)[4]

---

[4]3Q 2005 10-Q is shorthand for the third-quarter 2005 10-Q SEC filing, 2005 10-K is the 2005 10-K SEC filing, etc.

These statements are alleged to be false or misleading for only the generally applicable reasons in ¶¶ 135 and 139 discussed, and rejected, supra.

### 2. July 27, 2006 Conference Call (¶¶ 142-43)

The factual allegations in the complaint, taken as true, do not establish that Gozani's statement that "we are not involved . . . in billing by our customers. . . . other than providing them with basic published information on expected coding practices" is false or misleading. First, doctors bill insurers; Neurometrix does not generate or process those bills. Second, the complaint contains specific factual allegations that defendants did not answer customer questions concerning reimbursement, other than providing information on expected coding practices. These allegations include "[o]ther former employees confirm[ing]" that defendants avoided answering questions about reimbursement (¶ 98), and a confidential witness stating that defendants did not inform physicians about which insurance carriers would reimburse for NC-Stat (¶ 99). (See generally ¶¶95-100")

### 3. 2Q 2006 10-Q; October 26, 2006 Conference Call; 3Q 2006 10-Q (¶¶ 145, 147-48, 150-51)

The factual allegations do not support the assertion that there were "pervasive" billing problems when these three statements were made, as plaintiffs contend. One insurer in two states had declined to reimburse for NC-Stat treatments (¶ 99), and two clients were dissatisfied (¶ 81-90). Further, one of the challenged statements, the 3Q 2006 10-Q (¶ 150), is several hundred words long, exclusively addressed to

9

reimbursement risk, and discloses more reimbursement problems than plaintiffs allege existed. These statements are not misleading.

### 4. May 1, 2007 Conference Call; July 31, 2007 Conference Call; October 30, 2007 Conference Call (¶¶ 157, 161, 165)

The assertion that the RVUs for the neurology CPT codes are valued for NC-Stat, which plaintiffs describe as "blatantly false," is a mischaracterization of defendant Gregory's statements in the three conference calls.[5] In each call Gregory stated that the NC-Stat is FDA-approved, the standard CPT codes describe the service the NC-Stat performs, and the Medicare Physician Fee Schedule details reimbursement for those codes. He does not state that the RVUs for these codes were weighted or valued for the NC-Stat.

Gregory is also expressly stating a belief. The factual allegations establish only that two directors of reimbursement and some, but not all, insurance companies did not share Gregory's reasoning that the existing CPT codes applied to NC-Stat. There are no factual allegations that Gregory himself believed other than what he stated. Accordingly, as with all the preceding statements, the factual allegations in the complaint, taken as true, do not establish that this statement was misleading or false.

## III.     Conclusion

---

[5]This "blatantly false" allegation is also made in regards to the 1Q 2007 10-Q, 2Q 2007 10-Q, and the 3Q 2007 10-Q. (¶¶ 159, 163, 167.) However, none of these statements discuss the Medicare Physician Fee Schedule.

Because plaintiffs have not identified any material misrepresentation or omission, they have not met the requirements of a Rule 10b-5 claim (and the derivative § 20(a) claim).  Defendants' motion to dismiss (Docket # 38) is ALLOWED.

| | |
|---|---|
| December 8, 2009 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL |
| | UNITED STATES DISTRICT JUDGE |